NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel* | : | |
| HEFNER | : | **Hon. Dennis M. Cavanaugh** |
| | : | |
| Plaintiff/Relator | : | **OPINION** |
| | : | |
| v. | : | Civil Action No. 01-CV-4078(DMC) |
| | : | |
| HACKENSACK UNIVERSITY | : | |
| MEDICAL CENTER, CENTER FOR | : | |
| INFECTIOUS DISEASES, P.A. and | : | |
| NORTH JERSEY PRIMARY CARE | : | |
| ASSOCIATES, P.A. | : | |
| | : | |
| Defendants. | : | |

———————————————————

DENNIS M. CAVANAUGH, U.S.D.J.:

     This matter comes before the Court on Defendant Hackensack University Medical Center, Defendant New Jersey Primary Care and Defendant Center for Infectious Diseases individually filed motions for summary judgment.  Also before the Court is Plaintiff/Relator Phil Hefner's cross-motion for partial summary judgment on Counts One and Two of the Amended Complaint.  No oral argument was heard pursuant to Fed.R.Civ.P. 78. For the following reasons Defendants' motions for summary judgment are **granted**.  Plaintiff's cross-motion for summary judgment is **denied**.

## I. BACKGROUND

     Plaintiff/Relator Phil Hefner ("Hefner" or "Relator") brought this *qui tam* action under the False Claims Act (FCA), 31 U.S.C.A. § 3729-33 (1994, 2001 supp.), against Defendants Hackensack University Medical Center ("HUMC"), Center for Infectious Diseases, P.A. ("CID"), and North

1

Jersey Primary Care Associates, P.A. ("NJPC"). The Complaint was initially filed under seal in the U.S. District Court for the District of Maryland in or about August/September, 2000. On August 22, 2001, this case was transferred to the District Court of New Jersey pursuant to 28 U.S.C. § 1404. Since that time, the parties have filed amended pleadings and engaged in discovery, all of which culminated in the filing of the instant motions.

In his First Amended Complaint, Hefner alleges that the Defendants (1) submitted false claims under the Medicare program and federal grants, (2) created false medical records in connection with the presentation of claims to Medicare and federal grants, and (3) engaged in a retaliatory dismissal of Relator from his employment.

HUMC is a university-based medical center in Hackensack, New Jersey. NJPC, also located in Hackensack, is a New Jersey professional service corporation, organized by a licensed physician who is employed by HUMC in an administrative capacity. CID is the private practice of several physicians, including Dr. Steven Sperber, also located in Hackensack. CID was incorporated on March 21, 1997 and its Board of Directors include Dr. Steven Sperber, Dr. Jerome Levine and Dr. Peter Gross. See Gorrell Affidavit, Ex. D., CID Cert. of Incorporation. Sperber testified at his deposition that CID performs the billing and pays the expenses for work performed by Sperber in the CID office. Payments received for Sperber's services rendered on behalf of CID are assigned to CID, and CID does not assign those payments to HUMC. Sperber does not have an office at HUMC. Sperber Dep., 30:5-31:11.

Pursuant to January 1998 Tenant Space Agreement, CID pays rent to HUMC for space on the hospital campus to be used for medical offices and related purposes. Pursuant to a January 1999 Amended Tenant Space Lease, CID pays rent to HUMC in addition to certain monthly operating

2

expense charges. Additionally, under a certain licensing and leasing agreement, CID pays HUMC an agreed annual amount in consideration for using the support services of certain administrative hospital personnel for the CID physicians' private practice of medicine. Gorrell Affidavit, Ex. C.

On March 1, 1998, Dr. Sperber entered into an employment agreement with NJPC. Through this agreement, Sperber treats patients at HUMC's Infectious Disease Clinic ("the ID Clinic") not in excess of 10 hours per week. Sperber is paid a fixed hourly rate for those services. The Agreement provides that NJPC shall bill for all services performed by Sperber under the Agreement, and shall be entitled to all payment received for those services. Gorrell Affid., Ex. C; Sperber Dep. 20:15-18, 22:1-4, 40:4-9; Capek Dep., 71:15-18.

HUMC operates a variety of programs for persons infected with HIV, including hospice programs and medical clinics (HUMC Mov. Brief at 5.) In 1994, HUMC entered into a Grant Agreement with the City of Paterson, Department of Human Resources in accordance with the Ryan White Comprehensive Emergency AIDS Resources Emergency Act of 1990. (CID Mov. Brief at 15). This Grant Agreement was commonly referred to as the Ryan White Grant ("the Grant"). Beginning in 1995, HUMC received funding provided under the Ryan White Grant to provide various health care services to patients infected with HIV in certain clinics and outpatient sites operated by HUMC, such as the ID Clinic. (Id.) The grant was administrated by Nurse Mary Ann Collins ("Nurse Collins"), an HUMC employee. (Id.) Dr. Sperber performed services in the ID clinic pursuant to his employment with NJPC. (Def. HUMC Mov. Brief at 7.) These services were covered under the Ryan White Grant. Id.

The Grant Agreement provided for an annual payment which was not to exceed an agreed upon amount which varied over the years of its existence and which covered a variety of services

3

(Id.)  These services included social work services, home health aids, housing, transportation and other emergency assistance.  (Id.)  With regard to physician services, the Grant provided for target service figures and estimated costs associated with such services, as opposed to payment being based on a specific amount for each clinic visit.  (Id.)

One of the conditions of the Grant was that it not be used to replace existing financial support for HIV-related services.  (Id. at 6.)  In the Year 2000 Grant Agreement, section entitled "Maintenance of Effort and Cost Principles", it provided "[f]unds may not be used to provide items or services for which payment has already been made or can reasonably be made a third-party payer, including Medicaid, Medicare, and/or other State or local entitlement programs, prepaid health plans, or private insurance." (Jackson Cert. Ex. 8, 000372).

Nurse Collins was responsible for preparing monthly reports/invoices of services for which reimbursement was sought from the Grant.  (HUMC Mov. Br. at 7.)  Each invoice contained itemized categories of allowable services, including the ID Clinic physician services.  (Id.)  The physician providing services at the Clinic pursuant to the Grant was Dr. Stephen Sperber.  (Id.)  All of the services provided by Dr. Sperber in the Clinic were covered under the grant.  (Id.)  Many of the submissions Nurse Collins prepared included the statement "I certify that all of the attached invoices have not been paid, and none of the items have previously [sic] reimbursed or submitted for payment." (Jackson Cert, Ex. 7, Collins Dep at 37:1-22).

Although the facts are in dispute as to exactly when, it is clear that at some point on or around July 2000, HUMC became aware that the services Dr. Sperber provided to patients in the Clinic were being funded and reimbursed by the Grant, but also billed and reimbursed by Medicare. At his deposition, Dr. Sperber testified he was unaware that HUMC was submitting Medicare claims

under his name and thought that the services in question were not being billed.  (Jackson Cert., Ex. 9, 60:11-15.)  Nurse Collins testified at her deposition that she became aware that Medicare was billed for services that were reimbursed under the grant when she was contacted by Marilyn Capek, the office manager of the CID practice to check if an error had been made in billing for the physicians in the clinic.  (Id. at 24:23 to 25:22.)

At his deposition, HUMC Compliance Officer Thomas Flynn described the circumstances surrounding the Medicare submissions.  (HUMC Mov. Br. at 9; Flynn Dep. at 58:24 to 60:5).  Mr. Flynn stated that at HUMC, the billing process generally involves data entry with the use of an allowance code for internal accounting purposes to create a credit for services that would not be billed.  (Id.)  Here, Mr. Flynn surmised, the code was not entered in for the services in question, thereby generating a receivable balance and a bill to Medicare.  (Id.)

In July 2000, Relator was assigned by Health Systems Management Network, Inc. ("HSMN"), a consulting firm, to work with the medical staff of HUMC in complying with documentation and billing practices required by federal regulations.  (Comp. at ¶10.)  In the course of his assignment, Hefner met with representatives of each clinical area in order to "set goals and objectives for each service, identify clinical leaders, create access to the medical staff and determine timetables and milestones."  (Id. at ¶11.)  As such, Hefner was granted direct access to HUMC medical staff.  (Id.)  On July 11, 2000, Hefner met with Marilyn Capek, an employee of CID, to discuss compliance issues.  (Id. at ¶12.)  In the Complaint, Hefner stated that Ms. Capek advised him "the Infectious Disease Section received a number of ongoing federal grants, and that HUMC routinely billed patient services to the government through one or more HUMC grants, and then rebilled these same services to the government again through Medicare."  (Id. at ¶13.)  Also, Relator

claims that Ms. Capek stated HUMC billed patient services to a private insurer, and then re-billed these same services to the Government through one or more HUMC federal grants. Id. Furthermore, Plaintiff alleges Ms. Capek stated HUMC's intentional double-billing was ongoing, and that she felt "at risk" should the double billing be discovered by state or federal authorities. (Id. at ¶14.) Shortly after this meeting, HSMN terminated the Plaintiff's involvement with HUMC. (Id. at ¶16.) On July 17, 2000, Hefner's employment with HSMN was also terminated. (Id.)

By way of letter dated September 11, 2000, NJPC informed Empire Medicare Services that a number of claims had been submitted to Medicare in error, as the services were already reimbursed through a Ryan White Grant. (See Affidvait of Joseph Gorrell, Ex. G.) NJPC reimbursed Empire Medicare Services in the amount of $5,258.97, in full repayment of the errant claims. Id.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is granted only if all probative materials of record, viewed with all inferences in favor of the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). The moving party bears the burden of showing that there is no genuine issue of fact and it must prevail as a matter of law, or that the non-moving party has not shown facts relating to an essential element of the issue for which he bears the burden. Celotex, 477 U.S. at 331. If either showing is made then the burden shifts to the non-moving party, who must demonstrate facts which support each element for which he bears the burden and must establish the existence of genuine issues of material fact. Id. The non-moving party "may not rest upon the mere allegations or denials of his pleading" to satisfy this burden, Fed.R.Civ.P. 56(e), but must produce sufficient evidence to support a jury verdict in his

6

favor. <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986).

### III. HEFNER'S CLAIMS UNDER THE CIVIL FALSE CLAIMS ACT

In the Complaint, Relator alleges violations of Section 3729 of the Civil False Claims Act ("FCA"), 31 U.S.C. § 3729-33 (1994, 2001 supp.).  Specifically, Relator alleges (1) Defendants violated 31 U.S.C. §3729(a)(1) by knowingly presenting false or fraudulent claims for payment to the government and (2) Defendants violated 31 U.S.C. §3729(a)(2) by knowingly creating false medical records to get false or fraudulent claims paid by the government.

*First Claim*

Because Hefner bears the burden of proof in establishing the elements of a prima facie FCA cause of action against Defendants, in order to survive Defendants' motions for summary judgment, Hefner must identify evidence that establishes the existence of all three essential elements of an FCA claim. See <u>Pertucelli v. Bohringer & Ratzinger</u>, 46 F.3d 1298, 1308 (3d Cir.1995).  As such, Relator must provide the court with evidence demonstrating that Defendants acted knowingly, recklessly or with deliberate ignorance in submitting or causing to be submitted to the government a false or fraudulent claim for payment that caused the government economic loss.  <u>U.S. ex rel. Watson v. Connecticut General Life Ins.</u> Co. 2003 WL 303142, *4 (E.D.Pa.2003).  If Hefner  is unable to provide evidence sufficient to establish the existence of each of these elements, Defendants will be entitled to summary judgment on Hefner's FCA claim. <u>Id</u>.

The FCA establishes liability for anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government...a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record

or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(1),(2)(1994).  The *qui tam* provision, 31 U.S.C. § 3730(b)(1)(1998), allows for an individual to sue, on behalf of the government, a person who the relator knows to have violated Section 3729.  The remedial provisions of the FCA permit recoveries of three times the amount of damages sustained by the government plus penalties of $5,500 to $11,000 per claim.  Under the *qui tam* provision, the relator can recover a portion of the damages to which the government is entitled.  31 U.S.C. § 3730(d).

Defendants argue that Relator has not shown sufficient facts to meet his burden as to the elements of Section 3729.  To establish a prima facie case under Section 3729(a)(1), a relator must sufficiently allege: (1) the defendant presented or caused to be presented a claim to the United States for payment or approval; (2) the claim was false or fraudulent, and (3) the defendant knew the claim was false or fraudulent.  Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176 (3d Cir. 2001); 31 U.S.C. 3729(a)(1).  Innocent mistakes or negligence are not actionable under this section.  Hindo v. University of Health Sciences/The Chicago Medical School 65 F.3d 608, 613 (7th Cir. 1995).  As such, the Court will examine the sufficiency of facts alleged as to each element.

### A) First Element

To satisfy the first element of Section 3729(a)(1), Relator must prove that Defendants presented or caused to be presented to the Government a claim for payment.  A claim under the FCA includes any "request or demand...which is made to a contractor, grantee or other recipient if the United States Government provides any portion of the money...which is requested or demanded..."  31 U.S.C. §3729(c).  Here, it is undisputed that the invoices submitted by

8

Defendants pursuant to the Grant Agreement are claims within the definition of the FCA.  Also, a Medicare payment is deemed to be a claim within the meaning of the FCA.  See United States v. Krizek, 192 F.3d 1024 (D.C. Cir. 1999).  Therefore, each Medicare submission made by Defendants is also a claim within the meaning of the FCA.  With regard to both HUMC and NJPC, Relator has alleged sufficient facts to show their involvement in the act of submission of the claims to Medicare and the Ryan White Grant.  Specifically, the Court notes the claim forms submitted for Dr. Sperber's work in the Clinic identify NJPC as the name of the biller and HUMC as the name of the facility where services were rendered.  As such, this element has been sufficiently established as to those two Defendants.

CID disputes that it had any involvement in the submission of claims for approval or payment.  Relator argues that as an agent or affiliate of HUMC, CID is responsible for the submission of the claims even though it is a party other than that which actually submitted the claim.  CID avers that as a matter of law it cannot be considered an agent or representative of HUMC, or to have acted with HUMC as a single entity, and thereby cannot be held liable for the actions of the other Defendants.  Thus, the issue presented is whether Relator has presented sufficient proof that CID could be considered to have acted with HUMC as a single entity or as the alter-ego of HUMC.

Relator relies upon agency principles to establish liability against CID.  Many courts have applied agency principles to suits under the FCA.  U.S. ex rel. Magid v. Wilderman, 2004 WL 945153 (E.D.Pa. 2004) (internal citations omitted).  Under Third Circuit jurisprudence, a number of factors are to be considered in determining whether a subsidiary can be considered an alter ego.  Pearson v. Component Techonolgy Corp., 247 F.3d 471, 485 (3d Cir. 2001).  Those factors

include: "gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, non-functioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder." Id. at 485 (citations omitted). In addition, "the situation must show an element of injustice or fundamental unfairness, but a number of the aforementioned factors can be sufficient to show unfairness." United States v. Pisani, 646 F.2d 83, 88 (3d Cir.1981).

Applying the factors set forth in Pisani, CID does not appear to function as an alter-ego of HUMC. Only the relevant factors will be addressed by the Court. First, with regard to the corporate formalities, CID has submitted documentation evidencing its independent corporate form. In particular, CID is incorporated under New Jersey law and has its own Employer Identification Number. It maintains a Board of Directors. The directors and shareholders of CID adopted corporate resolutions and bylaws, a corporate seal, and approved the opening of bank accounts and the payment of corporate expenses. See CID Statement of Undisputed Material Facts, ¶¶3, 4. In addition, the shareholders of CID entered into a Stock Purchase Agreement governing the issuance and transfer of all CID stock. The shareholders executed a detailed Shareholders Agreement addressing governance and operations of CID. Id. at ¶¶5,6. CID has submitted as exhibits a number of examples of corporate records. See Gorrell Aff., Ex. D.. There is no evidence that CID was a facade for the operations of HUMC. Rather, detailed agreements exist governing the relationship between the parties, and remedies available in case of breach. Finally, no injustice results from recognizing the separate identity of CID. HUMC and NJPC are viable entities and well able to sustain liability.

In his Complaint, Relator refers to CID as an 'agent' or 'affiliate', which CID argues is an attempt by Relator to avoid the Pisani analysis applied above. In response, Relator argues that CID is subject to liability under the Pearson standard for affiliated corporate liability. The Pearson court explained that "affiliated corporate liability...is ultimately an inquiry into whether the two nominally separate identities operated at arm's length. Pearson, 247 F.3d at 495. Courts often apply the "integrated enterprise analysis" in examining claims of affiliated corporate liability. Id. The integrated enterprise test looks to four labor-related characteristics of affiliated corporations: interrelation of operations; common management; centralized control of labor relations; and common ownership or financial control. Id. at 485; NLRB v. Browning Ferris Indus. of Pa., Inc. 691 F.2d 1117, 1122 (3d. Cir 1992). Here, the integrated enterprise test does not support Hefner's position. Relator has provided insufficient evidence to indicate that operations are interrelated between CID and HUMC or that there is a common management between HUMC and CID. HUMC does not appear to have "centralized control" of CID's labor relations or other aspects of its medical practice. Finally, HUMC does not exercise common ownership or financial control of CID.

The Court recognizes that HUMC and CID do have certain characteristics in common. However, in order to overcome the strong presumption against piercing the corporate veil, Relator would have to allege more than facts that are explained by the sharing of support services. As such, the Court finds that Relator has not established liability on behalf of CID for the submission of false or fraudulent claims. Therefore, CID's motion for summary judgment is granted in its entirety and CID is dismissed as a party from this action.

***B) Second Element***

11

To satisfy the second element of Section 3729(a)(1), plaintiff must establish that the claims filed were false or fraudulent. The terms false or fraudulent are not defined in the FCA, however, "the juxtaposition of the word 'fraud' with the word 'false' plus the word 'claim' suggests that a false or fraudulent claim is one aimed at extracting money the government otherwise would not have paid." U.S. ex rel. Drescher v. Highmark, Inc., 305 F.Supp.2d 451, 457 (E.D.Pa. 2004)(internal citations omitted). Furthermore, the Supreme Court has held that the FCA "reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money" and as such, the term "false or fraudulent claim" should be construed broadly. Drescher at 457 (quoting United States v. Neifert-White Co., 390 U.S. 228, 232-33 (1968).

Here, Relator alleges that by improperly billing claims for medical services at the Clinic, Defendants (collectively) submitted false or fraudulent claims to the government. Specifically, Plaintiff alleges that the Medicare claims and the Grant invoices submitted by the Defendants were false. With regard to the Grant invoices, Relator argues the claims were false because language in the invoices stated the claims had not been previously submitted for reimbursement, when in fact Defendants had previously submitted Medicare claims for the same services. With regard to the Medicare claims, Plaintiff argues they were obviously false because Defendants subsequently repaid the claims and because Defendants represented in the Medicare claims that they were entitled to payment for services that the Government has previously agreed to fund under the Grant.

In its moving papers, HUMC argues that Plaintiff has failed to sufficiently allege that the claims filed were 'false' and that Relator is misguided in asserting that the duplicative or double-

billing *ipso facto* renders the claims false.  (HUMC Mov Brief at 20.)

To support its argument as to the Medicare claims, HUMC relies on the language of the Grant.  The Grant provided that "Grant funds may not be used to provide items or services for which payment has already been made or can reasonably be expected to be made by a third-party payor, including...Medicare."  (HUMC Mov. Brief at 21).  Applying the Grant language to the facts at hand, this appears to means that Grant funds could not be used for services properly reimbursed by Medicare.  HUMC argues that this provision was ambiguous and that at that time it caused considerable confusion to many Grant recipients.  In 2000, in apparent response to this confusion, the Health Resources and Services Administration (HRSA), the federal agency that administers the Ryan White Grant conducted a comprehensive study of third-party reimbursement practices, finding that 85% of hospitals had billing problems arising from third-party payer/grant situations.  (HUMC Reply Br. at 3-4).  In its report, HRSA found that Medicare is to be the payer of first resort for health care services in programs such as Ryan White.  Id.  As such, HUMC avers, here, submission of the claims to Medicare was certainly permissible and can not be considered false.

HUMC also addresses the falsity element with regard to the Grant invoices.  It argues that the claims are not false because the submissions were based on true, actually rendered services and that even if Medicare reimbursed these services, they were still entitled to reimbursement under the Grant.

The essence of HUMC's argument with regard to falsity appears to be that services rendered for the ID Clinic patients properly should have been first billed to Medicare, and then to the Grant, and because that is exactly what they did, none of the submissions can be considered

13

false. HUMC cites case law from a variety of circuits addressing the "falsity" element in a FCA claim, but all can be easily distinguished from the situation at hand.  More common examples of falsity include the billing of the government for medically unnecessary care, or billing for more hours than that for which care was actually rendered.  See *cf*. United States v. Krizek, 7 F.Supp 2d 56 (D.D.C. 1998).  Here, the question of whether the claims were false turns on whether or not the claims HUMC submitted were for money it was not in fact entitled, the premise being that it HUMC falsely certified bills as being due and owing.  HUMC's reimbursement of monies paid out by Medicare seems to belie its hindsight argument that it was after all entitled to the Medicare reimbursement.

Here, the Medicare claims do not appear to be false on their face.  They were generated by the billing department at HUMC because services were rendered by Dr. Sperber in the Clinic. For an undetermined reason, these same services were also billed in the form of invoices to the Grant, accompanied by language attesting to the fact that the amount requested remained outstanding.  At the time, HUMC believed that the services were rightfully to be paid by Grant.

The Court recognizes HUMC's argument that there was considerable confusion with regard to the appropriate billing of Grant services; that confusion is germane to the instant action. It also recognizes that HUMC now has the benefit of clarification from the HRSA as to how proper billing procedures were to be followed.  Nevertheless, the simple fact that HUMC filed claims with both Medicare and the Grant and accepted payments for the same services creates prima facie evidence that one of the claims was false.  Even assuming *arguendo* that the Medicare billings were in fact not false, and rather appropriate, the fact still remains that the Grant invoices were certified as due and owing.  Specifically, Relator has identified various

14

certifications signed by Nurse Collins attached to the Grant invoices that stated, for example, "I solemnly declare and certify...that the amount herein stated is justly due and owing."  (See Pl. Opp. to Def. Motion, pg 28).  In light of the above, and keeping in mind that the summary judgment standard is deferential to the assertions of the non-moving party, the Court finds that Relator has alleged sufficient evidence to suggest HUMC filed false claims under the definition of the FCA.  As such, the Court finds that Relator has satisfied its burden of proof as to the second element.

### C) Third Element- Scienter Requirement

It having been determined that the first two elements of Section 3729(a)(1) are not in dispute with regard to HUMC and NJPC, this case now turns on whether or not Plaintiff has sufficiently alleged the third element of Section 3729(a)(1), or satisfied the scienter requirement. As such,  Relator must show that Defendants "knew the claim was false or fraudulent." 31 U.S.C. 3729(a)(1).

For Section 3729 purposes, the term "knowingly" means that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or the falsity of the information.  31 U.S.C. § 3729(b) (1994).  No proof of specific intent is required.  Congress specifically amended the FCA in 1986 to include this definition of scienter, to make "firm...its intention that the [A]ct not punish honest mistakes or incorrect claims submitted through mere negligence." S.Rep. No. 99-345, at 7 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5272.  In a House Report accompanying the amendments, the Committee stated that its intent was not only "to confer liability upon those individuals who deliberately ignore or act in reckless disregard of

the falsity of the information contained in the claim..." but also to ensure:

> persons who ignore "red flags" that the information may not be accurate or those persons who deliberately choose to remain ignorant of the process through which their company handles a claim should be held liable under the Act.  The definition, therefore, enables the Government not only to effectively prosecute those who have actual knowledge, but also those who play "ostrich".

House Report 99-660, 99th Cong., 2d Sess., to accompany False Claims Act of 1986 (June 26, 1996).

In the Complaint, Relator alleges that HUMC submitted the claims at issue to the Government with actual knowledge of their falsity.  In response to Relator's allegations, both HUMC and NJPC contend they had no knowledge as to the falsity of the claims being submitted.  HUMC admits that "there was a breakdown in the tracking of physician services and submission of reimbursement requests in connection with the HUMC Infectious Disease Clinic" and that "the sloppiness may indeed be negligence, but it is far short of the 'knowing' submission of false claims...required under the FCA."  (Def. Mov. Brief at 22).  In the same vein, NJPC states "[i]t may be that NJPC acted negligently in delegating all of its billing responsibilities to HUMC, but negligent conduct does not rise to actionable claims under the FCA." (Def NJPC Reply Brief at 7).

Here, Relator has not presented sufficient evidence that Defendants had actual intent to defraud the government.  Rather, Defendants' actions in reimbursing Medicare would refute any such allegation.  However, as stated above, specific intent is not required under Section 3729.  Thus, the question for the Court is whether Defendants were simply negligent in failing to monitor their compliance with applicable Medicare regulations and Grant provisions, or whether the failure of Defendants to ensure compliance amounted to the conduct of an "ostrich"

16

defendant who fails to inquire about facts that would alert him to the presence of fraudulent or false claims.

Relator argues that Defendants' failure to ensure the veracity of the certifications attached to the Grant invoices was the equivalent of actual knowledge of their falsity.  In support of this argument, Relator cites a case from the Southern District of New York, holding that "failure to conduct a proper investigation before making a false statement may be sufficiently reckless to yield False Claims liability.  United States v. Raymond & Whitcomb Co., 53 F.Supp. 2d 436, 447 (S.D.N.Y. 1999).  In its opposition brief, Defendant HUMC rebuts this contention by relying on, *inter alia,*  a Third Circuit case where a *qui tam* action was based upon the carrier's alleged failure to identify and prevent duplicate claims from being presented to Medicare.  United States ex rel. Watson v. Connecticut General Life Insurance Co., 2003 WL 303142 (E.D. P.A. February 11, 2003).  The Court commented that the "occasional failure to catch duplicate claims was not caused by anything more than negligence or mistake, which are not actionable under the FCA." Id. at *9 (internal citations omitted).

Here, Defendants offer explanation of their conduct by again relying on the language of the Grant.  (Def. Mov Brief at 29).  They maintain that under the language of the Grant, as apparent from the regulations later issued by the HRSA, submissions were properly made to Medicare if available, thus negating any presence of fraudulent intent.  However, the contention that Defendants believed their conduct was permissible is somewhat belied by the fact that they reimbursed Medicare for payments made.

Nevertheless, Relator has failed to convince the Court that the submission of the claims to Medicare and the Grant was done either with deliberate ignorance or reckless disregard of the

truth or falsity of the information.  While it is clear that Defendants were negligent in the monitoring of their billing practices, the hiring of HSMN to monitor billing compliance and the return of reimbursed monies to Medicare upon discovery of their erroneous acceptance is more evidence of mistake than knowing submission of false claims.  As such, the Court finds that Relator has failed to establish the third element of a prima facie case for filing of false claims under the FCA.

Therefore, Relator has only succeeded in alleging sufficient evidence to support two of the three elements required to maintain a cause of action under Section 3729(a)(1) of the FCA. As such, Count One of Relator's Complaint must be dismissed as to Defendant HUMC and Defendant NJPC.

**SECOND CLAIM**

In his Second Claim, Relator alleges that "upon information and belief, Defendants created medical records of patient services, created and submitted claims to the U.S. Department of Health and Human Services and to Medicare, and received payment of these claims" in violation of Section 3729(a)(2).  Comp. at ¶23.  In order to prove a claim under Section 3729(a)(2), in addition to the requirements of Section (a)(1), a plaintiff must also show that the defendant made or used (or caused someone else to be used) a false record to cause a false claim to be paid or approved.  See U.S. ex. rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 242 (3d Cir. 2004); see also John T. Boese, Civil False Claims and Qui Tam Actions, § 2.01[B] at 2-27 (2d. ed. 2005 Supp).

Here, Relator has not provided sufficient evidence that Defendants created false records of patient services to get false claims paid or approved.  Rather, the evidence presented to the

Court indicates the claims submitted by Defendants were not premised upon false patient records, but rather questionable in the repetitive nature of billing for actual services rendered.  As such, Count Two of Plaintiff's Complaint must be dismissed as to all remaining Defendants.

**THIRD CLAIM**

In his Third Claim for relief in the Complaint, Relator alleges Defendant HUMC[1] engaged in a retaliatory dismissal of Relator from his employment.  Comp. at ¶27.  Specifically, Relator alleges Defendant "intentionally and maliciously" caused his discharge, and that Defendant was motivated by Relator's discovery of the alleged fraud and his actions in pursuing the instant action.  Id.

Section 3730(h), known commonly as the "whistleblower" provision, protects employees who assist the government in the investigation and prosecution of violations of the False Claims Act.  See Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 185-6 (3d. Cir. 2001)(citing Neal v. Honeywell Inc., 33 F.3d 860, 861 (7th Cir.1994)).  To state a cause of action under Section 3730(h) of the FCA, Relator must show that he 1) engaged in conduct protected under Section 3730; 2) was discharged by HUMC; and 3) HUMC's discharge of Relator was motivated by Relator's protected conduct.[2]  See Id. at 188; see also Boese at § 4.11[B][1] at 4-210 (2d. ed. 2005 Supp).  As such, the Court will examine the sufficiency of Relator's allegations with respect to each of the required elements.

_____

[1] Although Relator refers to Defendants generally in the Third Claim of the Complaint, it is evident from the papers filed with the Court that HSMN was hired by Defendant HUMC as an outside compliance consultant.  As such, the Court takes the liberty of assuming Relator's arguments only apply to Defendant HUMC.

[2] Section 3730(h) reads, in pertinent part: [a]ny employee who is discharged...by his or her employer because of lawful acts done by the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.  31 U.S.C. 3730(h).

The first element Relator must establish is that he engaged in conduct protected under Section 3730(h).  Relator asserts that his "efforts to investigate the Defendants' fraud and file this action reporting Defendants' fraud were lawful and in furtherance of this action under the Act." (Comp. at ¶27.)  HUMC disputes that Relator engaged in any protected conduct.  To support its argument, HUMC relies on Hutchins, arguing that under Third Circuit law: "where an employee's job duties involve investigating and reporting fraud, the employee's burden of proving he engaged in "protected conduct" and put his employer on notice of the "distinct possibility" of False Claims Act litigation is heightened."  Hutchins at 191.

Here, Relator was hired by HSMN as a "compliance consultant in connection with an audit of HUMC's hospital and physician billing and documentation activities."  Comp. at 10.  As such, Relator must overcome the presumption that he was merely acting in accordance with his employment obligations when he discovered the billing discrepancies, as opposed to investigating on his own accord the possibility of false claims being filed.  Yuhasz v. Brush Wellman, Inc., 341 F.3d 559, 568 (6th Cir. 2003).

What exactly did Relator do that could be seen as protected conduct or a precursor to FCA litigation?  According to his Complaint, he met with Marilyn Capek in the course of his duties as a compliance consultant, wherein she informed him of her concerns about billing procedures.  (Comp. at ¶12.)  After that meeting, Relator claims he was terminated by HSMN, allegedly at the prompting of HUMC.  (Id. at ¶16.)

A review of relevant case law sheds light on what constitutes protected conduct when an employee's job duties include investigation of billing compliance.  In Eberhardt v. Integrated Design & Constr., Inc., 167 F.3d 861, 868 (4th Cir.1999), the Court of Appeals for the Fourth

20

Circuit noted that when "an employee is assigned the task of investigating fraud within the company, courts have held that the employee must make it clear that the employee's actions go beyond the assigned task [in order to allege retaliatory discharge under § 3730(h) ]." See also Hutchins at 191.  In U.S. ex. rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1523 (10th Cir. 1996), the Tenth Circuit Court of Appeals found that an employee whose job duties included monitoring compliance with applicable Medicaid requirements did not engage in "protected conduct" when she reported to her supervisors that the facility was not complying with various Medicaid requirements.  Because the reporting was part of plaintiff's job duties, the reporting to her supervisors, without more, did not sufficiently put defendants on notice of a potential *qui tam* suit.  Id. at 1523.

Here, the evidence presented to the Court by Relator does not identify any point at which Relator made HUMC aware that he was intending to pursue a *qui tam* action.  Furthermore, the purpose of meeting with Marilyn Capek was to discuss compliance concerns.  The fact that Relator engaged in a conversation with Marilyn Capek regarding potential false claims concerns did not put HUMC on notice that Relator was contemplating a *qui tam* action because it was the very job he was assigned to do.  Relator has failed to provide any evidence that he took sufficient steps to put HUMC on notice that he was contemplating or acting in furtherance of an FCA action, and he has not shown that he suggested to HUMC that he intended to report possible noncompliance to government officials.  *cf.* Neal, 33 F.3d at 861.  As such, the Court finds that Relator did not engage in conduct sufficient to rise to the level of protected conduct under Section 3730(h).

In light of the above, Plaintiff's Complaint fails to state a sufficient claim for retaliatory

discharge under Section 3730(h).  Therefore, Defendant HUMC's motion for summary judgment as to Claim Three of Plaintiff's Complaint must be granted.

## IV.CONCLUSION

In sum, the Court finds that Plaintiff has failed to sufficiently allege evidence to support a prima facie case under Section 3729(a)(1) or (a)(2) of the FCA.  Also, Plaintiff has not sufficiently alleged elements required to support a claim for retaliatory discharge under Section 3730(h).  Therefore:

1) Defendant CID's motion for summary judgment is granted on the grounds that Relator did not establish CID submitted false claims under Section 3730(a)(1)

2) Defendant NJPC's motion for summary judgment is granted on the grounds that Relator failed to establish NJPC knowingly submitted false claims under Section 3729(a)(1) or false records under Section 3729(a)(2).

3) Defendant HUMC's motion for summary judgment is granted on the grounds that Relator failed to establish HUMC knowingly submitted false claims under Section 3729(a)(1) or false records under Section 3729(a)(2), and failed to sufficiently allege a claim for retaliatory discharge under Section 3730(h).

4) Plaintiff/Relator Hefner's motion for summary judgment is denied in its entirety in light of the Court's holdings granting Defendants' motions for summary judgment.

As such, for the foregoing reasons, Plaintiff/Relator Hefner's Complaint is dismissed in its entirety with prejudice.  An appropriate Order accompanies this Opinion.

 S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.

Date:          December 21, 2005
Original:      Clerk's Office
Copies:        All Counsel of Record
               The Honorable Mark Falk, U.S.M.J.
               File